UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                       11 Cr. 795 (RPP)

       - v. -

                       **OPINION AND ORDER**

EDGAR SANCHEZ-MANZANAREZ,

               Defendant.
-----------------------------------------------------------X
**ROBERT P. PATTERSON, JR., U.S.D.J.**

## I. PROCEDURAL HISTORY

By motion dated October 21, 2011, Defendant Edgar Sanchez-Manzanarez (the

"Defendant") moved to suppress physical evidence and his post-arrest statements on the grounds

that he was unconstitutionally seized in violation of the Fourth Amendment.  On November 4,

2011, the Government filed a response to the Defendant's motion, arguing that the motion should

be denied without a hearing.  Oral argument was held by the Court on November 8, 2011.

On December 1, 2011, the Court ordered that an evidentiary hearing be held in the matter

after determining that the parties' submissions did "not provide sufficient facts to allow the Court

to make a determination on the motions in front of it."  (Order Dec. 1, 2012, ECF No. 12.)  The

evidentiary hearing was held on December 7, 2011.  On January 6, 2012, the parties submitted

post-hearing briefs.

For the reasons set forth below, the Defendant's motion to suppress is denied in part and

granted in part.

## II. FACTUAL BACKGROUND[1]

Special Agents Dudley Harris ("SA Harris"), Mynor Mazariegos ("SA Mazariegos"), and

Kevin Wood ("SA Wood") of the Drug Enforcement Administration ("DEA") each testified at

---

[1] The following is taken from evidence and testimony presented at the evidentiary hearing.  The Defendant did not
submit any affidavits in support of his motion, nor did he call any witnesses or offer any evidence at the hearing.

the evidentiary hearing. SA Harris has worked in law enforcement for 22 years, and has been with the DEA for the last 11 years. (Transcript of Dec. 7, 2011 Evidentiary Hearing ("Tr.") at 3-4.) SA Mazariegos has worked for the DEA for approximately 15 years, and is fluent in both English and Spanish. (Tr. at 57-58.) SA Wood has worked for the DEA for two years. (Tr. at 61.) Neither SA Harris nor SA Wood speak Spanish. (Tr. at 7, 77.)

SA Harris and SA Wood testified that the Defendant's arrest in this case was part of a larger investigation into drug trafficking which involved the assistance of a confidential source (the "source"). (Tr. at 4, 61.) The source has been working with the DEA for approximately two years (Tr. at 4), and was mainly involved with a cocaine trafficking organization based in Utah and California (Tr. at 61-62). During that time, the source has provided reliable information that has led to arrests and the seizure of narcotics. (Tr. at 5.)

On or about July 17, 2011, SA Harris received information from the source indicating that the source had spoken with a narcotics broker in Utah named Homero Chavez ("Chavez") and a narcotics supplier in Mexico named Jose Luis ("Luis") about purchasing a quantity of heroin that was to arrive in New York City in the near term. (Tr. at 5-6, 62.) The source had additional telephone conversations with these individuals on July 19th and 20th, 2011. (Tr. at 7.) SA Harris monitored and recorded these calls (which were in Spanish), and was debriefed by the source on the sum and substance of each conversation. (Tr. at 7.) On July 19, 2011, the source spoke with Luis and Chavez, and was informed that the heroin was in route to New York City, and that the persons carrying the drugs (the "couriers") would arrive the next day. (Tr. at 8, 63.) On July 20, 2011, Luis informed the source that the couriers had arrived in New York City, and that he would contact the source later that day with their exact location. (Tr. at 8.) As shown by the transcripts of the recorded conversations, the plan was for the source to meet the couriers,

2

and to test the heroin before purchasing it. (Dec. 7, 2011 Evidentiary Hearing ("Hearing"), Gov. Ex. 8.) At approximately 4:00 p.m. on the afternoon of July 20, 2011, Luis told the source that the couriers were at the Hotel Pennsylvania (the "Hotel"). (Tr. at 8; Gov.'s Post-Hearing Mem., Ex. C ("Ex. C") at 3.) In addition, Luis told the source that the couriers had been unable to secure a hotel room because they had only cash, and the hotel required a credit card to check in.[2] (Tr. at 11; Ex. C at 2.) Luis asked the source if he could rent the couriers a room at another hotel instead. (Ex. C at 3.) When the source asked Luis for the couriers' phone number, Luis informed the source that the couriers "don't have a cell phone, they just have a radio." (Ex. C. at 4.) The source told Luis to give the couriers the source's phone number so that they could call him and relay their location to him. (Ex. C at 10.) The source promised that he would then "go and get them." (Ex. C at 11; see Tr. at 63.)

Upon learning of this information, a group of approximately seven agents,[3] including SA Harris and SA Wood, drove to the Hotel, which is located on the east side of 7th Avenue, in between 32nd Street and 33rd Street, in Manhattan. (Tr. at 12, 32; Hearing, Gov. Ex. 1.) The agents arrived at the Hotel around 4:30 p.m. (Tr. at 32), and set up surveillance on 7th Avenue close to the main entrance of the Hotel, with agents north and south of the entrance, as well as an agent in the lobby (Tr. at 13). As they were setting up the surveillance, SA Harris spoke with the source again, and asked the source if he could obtain a physical description of the couriers from Luis. (Tr. at 13.) Soon thereafter, the source called SA Harris and said that he had received a phone call from a telephone number with a 212 area code, and that he had spoken in Spanish with a young male, who sounded like he was probably in his thirties. (Tr. at 13.) The source told SA Harris that the male indicated that he was wearing a red shirt and was carrying a black

---

[2] The couriers had a "Mexican" credit card, but the Hotel would not accept it. (Tr. at 11; Ex. C at 3.)
[3] On cross-examination SA Harris testified that he was accompanied by Special Agents Wood, Sheedy, High, Dill, Jarnich, and Prescott. (Tr. at 35-36.) Each of the agents was armed. (Tr. at 45.)

suitcase. (Tr. at 13.) SA Harris understood this individual to be one of the couriers who had

tried to check into the Hotel. (Tr. at 13-14.) After receiving this information, and while on

surveillance, SA Harris made the following notation in his log book: "CS gets call from pay

phone 212 # H/M [Hispanic male] +/- 30 tells CS [] red shirt black bag." (Gov.'s Post-Hearing

Mem., Ex. D; Tr. at 51.)

SA Wood testified that after he arrived at the Hotel, he proceeded to Penn Station "to

look for a drug dog with any of the law enforcement agencies that operate down in the station."

(Tr. at 67.) Meanwhile, SA Harris received information from another agent conducting

surveillance that a subject wearing a red shirt with a black bag was in the lobby of the Hotel.

(Tr. at 15.) The subject then exited the Hotel and initially walked southbound on 7th Avenue

while talking on a cell phone. (Tr. at 15, 34.) A short time later, SA Harris observed the subject,

who was a young, Hispanic male (later identified as the Defendant), standing on 7th Avenue in

the vicinity of 32nd Street. (Tr. at 16.) SA Harris testified that he confirmed that the Defendant

"appeared to be waiting for somebody," and was "look[ing] up and down 7th Avenue." (Tr. at

16.) At this point in the afternoon there was heavy vehicle traffic on 7th Avenue, as well as

fairly heavy pedestrian traffic on the sidewalk. (Tr. at 17-18.) After about ten or fifteen minutes,

SA Harris determined that the Defendant was by himself, and made the decision to approach the

Defendant. (Tr. at 17.)

SA Harris and the five other agents[4] approached and surrounded the Defendant. (Tr. at

16-17, 36.) SA Harris, who was wearing a badge on a chain around his neck, identified himself

as law enforcement. (Tr. at 18.) SA Harris asked the Defendant for identification, and the

Defendant provided him with a Mexican passport, (Tr. at 38), as well as a "USA B1/B2

---

[4] SA Wood was still at Penn Station at this point. He later returned to the area where the Defendant was being questioned and joined the other agents. (Tr. at 68.)

Visa/BCC" card and a "Permanent Resident Card" (Tr. at 18; Gov.'s Post-Hearing Mem., Ex. A

("Ex. A")). SA Harris observed that the names and dates of birth differed on the two cards.[5] (Tr.

at 19; see Ex. A.) According to the identification provided, the Defendant was either 21 or 22

years of age. (See Ex A; Tr. at 56-57.) SA Harris told the Defendant that he was conducting an

investigation, and asked the Defendant where he was coming from. (Tr. at 19.) At this point, the

Defendant indicated that he was more comfortable speaking in Spanish.[6] (Tr. at 19.)

SA Harris testified that he made a phone call to SA Mazariegos, a native Spanish

speaker, and told SA Mazariegos that he needed his help translating for a Spanish-speaking

suspect. (Tr. at 19, 58.) SA Harris testified that he asked SA Mazariegos to explain to the

Defendant that "we were law enforcement conducting an investigation," and to "ask[] him for

consent to search his personal belongings." (Tr. at 19-20.) SA Harris then handed the telephone

to the Defendant, and observed the Defendant speak with SA Mazariegos in Spanish on the

phone. (Tr. at 20.) SA Harris testified that the Defendant began nodding his head while

speaking on the phone, and after a short time, he leaned down and started unzipping his suitcase.

(Tr. at 20.) SA Harris then took the phone back from the Defendant. (Tr. at 20.)

At the hearing, SA Mazariegos testified to the substance of the conversation he had with

the Defendant. (Tr. at 58-59.) First SA Mazariegos asked the Defendant what he was doing in

New York, to which the Defendant responded that he was there on vacation, and that he had

taken a bus from Phoenix. (Tr. at 59.) SA Mazariegos next asked the Defendant if he had any

contraband, to which the Defendant responded "absolutely not." (Tr. at 59.) According to SA

Mazariegos, when asked if he would give consent to search his person and his luggage, the

---

[5] The Visa lists the Defendant's name as "Edgar Sanchez Manzanarez" and his date of birth as October 1, 1989. The Resident Card lists his name as "Edgar Manzanarez" and his date of birth as October 5, 1988.
[6] SA Harris testified that he was able to communicate with the Defendant in English, but the Defendant "was clearly more comfortable in Spanish." (Tr. at 21.)

Defendant said "the agents could search anything." (Tr. at 59.) After speaking on the phone

with the Defendant, SA Mazariegos relayed the information he had received from the Defendant

to SA Harris. (Tr. at 59.) SA Harris testified that SA Mazariegos informed him that the

Defendant had indicated that he had come by bus from Arizona to New York City and was there

to shop, and that the Defendant had given consent for the agents to search his personal

belongings. (Tr. at 20-21.)

SA Harris and the other agents inspected the contents of the black bag. (Tr. at 21.) The

bag did not contain any drugs or drug paraphernalia (Tr. at 33), but it did contain a pillow, a

blanket, foot powder, and a copy of the Defendant's bus ticket (Tr. at 21). The bus ticket

indicated that the Defendant had been scheduled to depart Phoenix, Arizona at 11:40 p.m. on

July 17, 2011, and arrive in New York City at 1:15 p.m. on July 20, 2011. (Hearing, Gov. Ex.

3.) The Defendant was also given a pat-down search and no drug paraphernalia was recovered.

(Tr. at 40.) SA Harris testified that while he was on the ground inspecting the suitcase, he

noticed that the Defendant's shoes were "extremely large and a strange shape." (Tr. at 21.) At

this point, Special Agent Dill called for a narcotics dog,[7] (Tr. at 40, 70), and SA Harris asked the

Defendant if he would accompany the agents to a side street (Tr. at 23, 69). The Defendant

agreed and walked with the seven agents to a location just outside of a New York City Police

Department precinct, located on West 30th Street, east of 7th Avenue.[8] (Tr. at 23, 42-43, 69.)

A number of police cars were parked outside of the precinct, and there were uniformed

officers walking in and out of the building. (Tr. at 44, 75.) The agents were joined by a

uniformed, Spanish-speaking New York City police officer, which raised the total number of

armed law enforcement officials present to eight. (Tr. at 44-45, 75.) With the officer translating,

---

[7] SA Wood's search for a dog in Penn Station had been fruitless. (Tr. at 68.)
[8] SA Wood, who was walking directly behind the Defendant, testified that while they were walking he noticed that the Defendant's "shoes were abnormally large, especially abnormally wide around where his feet were." (Tr. at 69.)

SA Harris told the Defendant that he did not believe the Defendant's story that he was in New York City to shop, and that he believed that the Defendant was in fact there to distribute narcotics. (Tr. at 24.) SA Harris asked the Defendant "where are the drugs?" multiple times, and told him to "show me where the drugs are." (Tr. at 45.) The Defendant became "visibly nervous"[9] in response to this questioning. (Tr. at 24, 70.) At this point, SA Harris pointed to one of the Defendant's shoes and asked him to take it off so he could inspect it. (Tr. at 25, 46, 52, 70.) The Defendant proceeded to hand his shoe to SA Harris. (Tr. at 25, 70.) When SA Harris looked inside of the shoe, he could see "plastic wrap containing an unknown substance protruding from the arches of the shoe." (Tr. at 25.) He also noticed that the shoe was "abnormally heavy." (Tr. at 25.) After making these observations, SA Harris handcuffed the Defendant and placed him under arrest. (Tr. at 26, 47.) SA Harris and SA Wood then searched the Defendant and uncovered two cell phones on his person. (Tr. at 47.) The agents subsequently exposed the Defendant's shoes to a New York City Police Department narcotics detection dog, who alerted to the shoes, as well the black bag carried by the Defendant, indicating the presence of narcotics. (Tr. at 26-27, 70.) The Defendant was then placed in a DEA vehicle and transported to the DEA field office in Manhattan. (Tr. at 27.)

Upon arriving at the office, the Defendant was processed for arrest, and brought into a questioning room. (Tr. at 27, 48.) In the presence of SA Harris and SA Wood, a Spanish interpreter read the Defendant his Miranda rights off of a "DEA Spanish Miranda advisement card." (Tr. at 28, 53, 77; see Gov.'s Post-Hearing Mem., Ex. B.) The Defendant never signed this DEA card, nor did he sign any other form indicating that he was waiving his Miranda rights, despite the fact that such forms were readily available in both Spanish and English. (Tr. at 49,

---

[9] SA Harris testified that the Defendant's "pulse seemed to quicken in his neck and he would no longer make eye contact with me which he had previously while speaking to me." (Tr. at 24-25.)

77-78.)  The agents proceeded to question the Defendant with the aid of the interpreter, and the

Defendant made a number of inculpatory statements.  (Tr. at 28, 48.)  During the questioning, the

Defendant appeared visibly upset.  (Tr. at 48-49.)

### III. MOTION TO SUPPRESS PHYSICAL EVIDENCE

**A.      Legal Standard**

On a motion to suppress evidence on the grounds of a warrantless arrest, "the burden is

on the Government to show that there was probable cause for the arrest."  United States v.

Rivera, 321 F.2d 704, 706 n.1 (2d Cir. 1963).

> Obviously, however, the moving party must make a preliminary showing as to the
> circumstances of the arrest sufficient to raise a question as to its legality.  But the
> question of how far, if at all, the moving defendant must go beyond showing that
> the arrest was without a warrant is not without its difficulties.

United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992) (quoting Rivera, 321 F.2d at 706 n.1).

Here, it is undisputed that the agents did not obtain a warrant for the Defendant's arrest.  Thus,

the onus is on the Government to demonstrate the arrest of the Defendant was supported by

probable cause.

**B.      Discussion**

*1.       The Agents Had Probable Cause to Arrest the Defendant When They First*
*          Approached Him on the Street*

A "warrantless arrest by a law officer is reasonable under the Fourth Amendment where

there is probable cause to believe that a criminal offense has been or is being committed."

Devenpeck v. Alford, 534 U.S. 147, 152 (2004).  "Whether probable cause exists depends upon

the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of

the arrest."  Id.  "Probable cause does not require absolute certainty," Boyd v. City of New York,

336 F.3d 72, 76 (2d Cir. 2003), rather, the Court must look to the "totality of the circumstances"

and "must be aware that probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002).

The Government argues that "the agents had probable cause to arrest the defendant prior to even approaching him" based on the informant's tip, which provided "substantial, reliable information to believe that the defendant was involved in a conspiracy to distribute narcotics and was in possession of a large quantity of narcotics."  (Gov.'s Resp. to Def.'s Mot. to Suppress at 2, 3.)  Probable cause may be based upon information from a confidential informant so long as the tip bears sufficient "indicia of reliability."  Adams v. Williams, 407 U.S. 143, 147 (1972). Courts must assess whether an informant's tip establishes probable cause under the "totality-of-the-circumstances" test set forth by the Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983).[10]  In Gates, the Supreme Court abandoned the rigid two-pronged test of Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969), which required that both the "basis of knowledge" and "veracity" of the informant be independently established, in favor of a more "flexible, easily applied standard."  Id. at 239.  The Court further noted that the totality-of-the-circumstances analysis has "consistently recognized the value of corroboration of details of an informant's tip by independent police work."  Gates, 462 U.S. at 241. Indeed, the Second Circuit has held that:

> [w]hen the informant's tip, standing alone, lacks sufficient indicia of reliability because it does not do enough to establish the informant's basis of knowledge and veracity, it may still support a finding of reasonable suspicion if sufficiently corroborated through independent police investigation.  Draper v. United States, 358 U.S. 307 (1959), provides the classic example.

United States v. Elmore, 482 F.3d 172, 179 (2d Cir. 2007).

---

[10] Though Gates dealt with the standard used by a magistrate judge in considering an application for a warrant premised to some degree upon a tip by a confidential informant, the rule annunciated applies in equal force to considering whether probable cause exists to make a warrantless arrest of a suspect.  See Pena, 961 F.2d at 339.

Notably, the facts of this case are quite similar to those of Draper. In Draper, an informant reported that an individual would arrive in Denver on a train from Chicago on one of two days, and that he would be carrying a quantity of heroin. Draper, 358 U.S. at 309. The informant also supplied a physical description of the defendant, and predicted that he would be wearing a light colored raincoat, brown slacks and black shoes, would be carrying a "tan zipper bag," and would be walking fast. Id. at 309, n.2. The informant gave no indication of the basis of his information. When police identified a man matching the informant's description arriving at the train station on one of the stated dates, they stopped, arrested, and searched him. Id. at 309. Their search uncovered two envelopes containing heroin and a syringe. Id. In upholding the trial court's decision to deny the defendant's motion to suppress, the Supreme Court noted that the arresting officer

> had personally verified every facet of the information given him by [the informant] except whether petitioner had accomplished his mission and had the . . . heroin on his person or in his bag. And surely, with every other bit of [the informant's] information being thus personally verified, [the officer] had "reasonable grounds" to believe that the remaining unverified bit of [the informant's] information—that [petitioner] would have heroin with him—was likewise true.

Id. at 313. The Court concluded that, "under the facts and circumstances here, [the officer] had probable cause and reasonable grounds to believe the petitioner was committing a violation of the narcotics laws of the United States relating to narcotic drugs at the time he arrested him." Id. at 314.

Here, DEA agents knew that a reliable confidential source was in contact with a narcotics broker and a narcotics supplier who were the targets of a long-term investigation. Over the course of several recorded telephone conversations, the targets updated the source on the progress of narcotics that were going to be delivered to New York City on July 20, 2011. The

10

source advised agents that an individual involved with the distribution of narcotics had unsuccessfully attempted to check-in to a specific hotel with cash and Mexican identification. The source further stated that the individual was a young Hispanic male wearing a red shirt and carrying black luggage, who, despite being unable to check-in, had remained in the vicinity of the Hotel. Agents conducted surveillance in the vicinity of the hotel, and noticed an individual matching the description given by the source in the lobby of the hotel. The individual eventually left the Hotel, but remained on 7th Avenue where he "appeared to be waiting for somebody." (Tr. at 16.) The agents observed the individual for between ten and fifteen minutes before approaching him. Thus, it was only after "personally verifying every facet" of the source's tip that the agents approached the Defendant. Draper, 358 U.S. at 313.

The Court's task "is simply to make a practical, common-sense decision whether, given all the circumstances set forth . . . before [it], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. The details supplied by the informant, in conjunction with the agents' investigation which independently corroborated each element of the informant's tip, and the recorded telephone conversation which established the informant's basis of knowledge, supplied agents with probable cause to arrest the Defendant at the time he was initially approached by the agents.

     *2.*     *The Search of the Defendant's Shoes was Justified Under the "Search Incident to Arrest" Exception to the Warrant Requirement*

Under the "search incident to arrest" exception to the warrant requirement, a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest. United States v. Robinson, 414 U.S. 218, 234-35 (1973). The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest

11

situations.  See id.  "The exception for searches incident to arrest permits the police to search a

lawfully arrested person and areas within his immediate control."  Smith v. Ohio, 494 U.S. 541,

543 (1990).  Moreover, the search incident to arrest exception permits an officer to conduct a full

search of an arrestee's person *before* he is placed under lawful custodial arrest as long as "the

formal arrest follow[s] quickly on the heels of the challenged search of [his] person" and the

fruits of that search are not necessary to sustain probable cause to arrest him.  Rawlings v.

Kentucky, 448 U.S. 98, 111 (1980).  As discussed, supra, the agents had probable cause to arrest

the Defendant when they first approached him outside of the Hotel, and did affect a full custodial

arrest of the Defendant immediately after searching his shoes.  Therefore, the search of his shoes

was justified as a search incident to a lawful arrest.  See, e.g. United States v. Montgomery, 377

F.3d 582, 591-92 (6th Cir. 2004) (troopers' warrantless evidentiary search of defendant's shoes

passes muster under the Fourth Amendment because the troopers had probable cause to arrest

defendant independent of the search and the defendant's lawful custodial arrest quickly followed

the search).

## IV. MOTION TO SUPPRESS POST-ARREST STATEMENTS OF THE DEFENDANT

**A.  Legal Standard**

"[I]f a suspect makes a statement during custodial interrogation, the burden is on the

Government to show, as a prerequisite to the statement's admissibility as evidence in the

Government's case in chief, that the defendant voluntarily, knowingly, and intelligently waived

his [Miranda] rights."  J.D.B. v. North Carolina, 131 S. Ct. 2394, 2401 (2011) (internal

quotations and citations omitted).  In this case, there is no dispute that the Defendant's post-

arrest statements were a product of custodial interrogation (see Gov.'s Post-Hearing Mem. at 14-

15), and thus the Court's analysis must focus on whether or not the Government has demonstrated that the Defendant made a valid waiver of his rights.

> The waiver inquiry has two distinct dimensions: waiver must be [1] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and [2] made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Berghuis v. Thompkins, 130 S. Ct. 2250, 2260 (2010) (internal quotations omitted).

## B.     Discussion

The Government has not met its burden of demonstrating that the Defendant's waiver of his Miranda rights was knowing and voluntary.[11] As the Supreme Court recently held in Berghuis v. Thompkins, "[i]f the State establishes that a Miranda warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate a valid waiver of Miranda rights. The prosecution must make the additional showing that the accused *understood* these rights." Id. at 2261 (emphasis added) (internal quotations and citations omitted); cf. Tague v. Louisiana, 444 U.S. 469, 471 (1980) (holding that evidence must be introduced to prove that the defendant knowingly and intelligently waived his rights before making the inculpatory statement). Here, the Government has not presented sufficient evidence to prove that the Defendant understood the Miranda warnings that he was given. The Government's assertion that the Defendant "waived" his Miranda rights is merely a conclusion, unsupported by evidence. The testimony indicates that SA Harris and SA Wood were in the room with an interpreter when the interpreter appeared to read the Defendant his

---

[11] In its post-hearing brief, the Government appears to misunderstand this burden. While it is true that "[a] waiver of Miranda rights is valid if it was the product of a knowing and voluntary choice, that is, that the Defendant understood the rights and chose to relinquish them without governmental coercion," (Gov.'s Post-Hearing Mem. at 14), the Government must introduce some evidence that the defendant *understood* these rights. The agents' testimony established that the Defendant was read his Miranda rights in Spanish, and that he was not coerced into speaking. However, as discussed infra, this alone is not enough to establish a valid waiver.

<u>Miranda</u> rights off of a card, in Spanish.[12]  Neither of the agents speak Spanish themselves, and the interpreter did not testify at the hearing.  Thus it is impossible for the Court to determine whether or not the interpreter indeed read the Defendant each of his <u>Miranda</u> rights off of the card.  Furthermore, neither of the agents could testify as to what the Defendant said in response to each of these warnings.[13]  The Defendant did not sign or initial any document acknowledging that he understood his rights and was waiving his rights, nor is there any evidence that the Defendant's verbal or non-verbal responses indicated that he understood and was waiving his rights.

"Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." <u>Miranda v. Arizona</u>, 384 U.S. 436, 475 (1966).  Thus, the Government is required to demonstrate that the Defendant understood these rights.  No such evidence has been presented here.  As such, the Defendant's motion to suppress his post-arrest statements is granted.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motion to suppress physical evidence is denied, and his motion to suppress the inculpatory statements he made after being taken into custody is granted.

---

[12] On redirect examination, SA Harris testified that "all I can say is that it appeared he was reading from the card." (Tr. at 53.)  On direct examination, SA Wood testified that "he appeared to be reading directly from the card."  (Tr. at 71.)

[13] The only evidence that the Defendant said *anything* in response to the warnings is SA Wood's testimony that the Defendant "acknowledged to the translator what we were informed was his willingness to speak with us."

IT IS SO ORDERED.

Dated: New York, New York
     February ⬩, 2012

                                    Robert P. Patterson, Jr.
                                       U.S.D.J.

**Copies of this order were faxed to**:

*Counsel for Defendant:*
Michael Blasie, Esq.
Cooley LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 479-6528
Fax: (212) 479-6275

*The Government:*
Niketh Velamoor
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
Tel: (212) 637-1076
Fax: (212) 637-2620
Email: niketh.velamoor@usdoj.gov